# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MARYLAND
### GREENBELT DIVISION

| | |
|---|---|
| **IN RE:** | **Case No. 21-10492** |
| **ELDERHOME LAND, LLC,** *et al.* | **Chapter 11** |
| Debtors. | **Jointly Administered re: Docket No. 39** |

| | |
|---|---|
| **ELDERHOME LAND, LLC,** *et al.* | |
| **THOMAS A. NORRIS** 15623 Riding Stable Road Laurel, Maryland 20707 | |
| Plaintiffs, | |
| **v.** | **Adv. Proc. No.: _____** |
| **EAGLE COMMERCIAL VENTURES, LLC** c/o the Corporation Trust, Inc. 2405 York Road, Suite 201 Lutherville Timonium, Maryland 21093 | |
| **EAGLEBANK** c/o the Corporation Trust, Inc. 2405 York Road, Suite 201 Lutherville Timonium, Maryland 21093 | |
| **EAGLE BANCORP, INC.** c/o the Corporation Trust, Inc. 2405 York Road, Suite 201 Lutherville Timonium, Maryland 21093 | |
| Defendants. | |

## ADVERSARY COMPLAINT

Plaintiffs ElderHome Land, LLC, Burtonsville Crossing, LLC (collectively, the "Norris Companies"), and Thomas A. Norris ("Mr. Norris") (together, the Norris Companies and Mr. Norris are referred to as the "Plaintiffs"), through their undersigned counsel, sue Defendants Eagle Commercial Ventures, LLC ("ECV"), EagleBank, and Eagle Bancorp, Inc. (collectively, ECV, EagleBank, and Eagle Bancorp, Inc. are referred to as the "Bank") and claim and allege as follows:

## JURISDICTION AND VENUE

1.  ElderHome Land, LLC ("ElderHome Land") and Burtonsville Crossing, LLC ("Burtonsville Crossing") the above-captioned Debtors, filed voluntary petitions for bankruptcy relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on January 25, 2021 (the "Petition Date") with the United States Bankruptcy Court for the District of Maryland.

2.  This action is brought as an adversary proceeding pursuant to Fed. R. Bankr. P. 7001, as the causes of action asserted herein are related to the Debtors' underlying bankruptcy. Accordingly, this Court also has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 because the outcome of this action could discharge or restructure the debt that caused the underlying bankruptcy proceeding.

3.  Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

4.  Plaintiffs consent to the entry of final orders or judgment by the Court in this adversary proceeding.

5.  The statutory predicates for the relief requested are 11 U.S.C. §105 and Fed. R. Bank. P. 7001(2).

## PARTIES

6.     Plaintiff ElderHome Land, LLC ("ElderHome Land") is a Maryland limited liability company in good standing with its principal office located at 15623 Riding Stable Road in Laurel, Maryland and a borrower under the loan documents.

7.     Plaintiff Burtonsville Crossing, LLC ("Burtonsville Crossing") is a Maryland limited liability company in good standing with its principal office located at 15623 Riding Stable Road in Laurel, Maryland and a borrower under the loan documents (collectively with ElderHome Land, LLC, the "Borrower).

8.     Plaintiff Thomas A. Norris ("Mr. Norris") is an individual who resides in Montgomery County, Maryland. At all relevant times described in this Complaint, Mr. Norris was the president of the Norris Companies and the guarantor under the loan documents.

9.     Defendant Eagle Commercial Ventures, LLC ("ECV"), a subsidiary of Eagle Bancorp, Inc., is a Maryland limited liability company with its principal office at 7815 Woodmont Avenue in Bethesda, Maryland 20814.

10.     Defendant EagleBank, a subsidiary of Eagle Bancorp, Inc., is a Maryland corporation with its principal office at 7815 Woodmont Avenue in Bethesda, Maryland 20814.

11.     Defendant Eagle Bancorp, Inc. is a Maryland corporation with its principal office at 7815 Woodmont Avenue in Bethesda, Maryland. Eagle Bancorp operates as the holding company for the Bank, which provides banking services to a target market of small and medium-sized businesses, with a focus on commercial real estate lending.

# FACTS COMMON TO ALL COUNTS

## I.    Background

12.    ElderHome Land, LLC owns approximately 5.86 acres of partially improved property located at 15300 Dino Drive in Burtonsville, Montgomery County, Maryland. At the time that the Norris Companies entered into the loan agreement at the center of this action, this property had a finished site pad and the Bank's appraised value was in excess of $2 million, premised on a senior housing facility having 110 units (the "ElderHome Property").

13.    Burtonsville Crossing, LLC is the owner of 11.14 acres of land, Parcel 365 in Burtonsville, Montgomery County, Maryland (the "BC Property"). At the time that the Norris Companies entered into the loan agreement at the center of this action, the Bank's appraised value of the property was in excess of $1 million.

14.    At the time of loan closing with ECV, the Norris Companies planned to construct a "state-of-the-art," 110-unit senior assisted living facility consisting of a total of 120 beds (the "Project") on the ElderHome Property. The BC Property was being sold to a church.

15.    In 2013, the Norris Companies sought financing from ECV to refinance existing debt and fund pre-development, closing and interest costs on the Project.

16.    Upon information and belief, ECV was new to the Maryland loan market and anxious to build a commercial network in the area. ECV's requests for real estate contact information and introductions by the Norris Companies to the Plaintiffs' prospective Project partners became a recurring theme throughout the duration of the Loan.

## II.     Negotiations

17.     Pursuant to ECV's "Terms and Conditions" letter of March 1, 2013, ECV agreed to lend 50 percent of the "as is" appraised value of the land, for a term of 24 months (the "Term Sheet"). *See* Term Sheet, attached and incorporated by reference as **EXHIBIT 1**.

18.     Plaintiffs' contact at the Bank was Prajay Jhaveri ("Mr. Jhaveri"), the Bank's Assistant Vice President Relationship Manager.

19.     On April 24, 2013, Mr. Jhaveri sent a letter, on the Bank's letterhead (as opposed to ECV's stationery) approving the loan in the amount of $1,483,877 (the "Approval Letter"). *See* April 24, 2013 Approval Letter, attached and incorporated by reference as **EXHIBIT 2**.

20.     The Bank's Approval Letter stated that the "[ECV] Loan Committee" approved the loan based on the Term Sheet dated March 1, 2013, which stated that the loan is for a term of 24 months, at a current interest rate of six percent and accrued interest of eight percent (to be paid upon loan pay-off) for a total of 14 percent. The only escrow was for interest reserve in the amount of $84,000.

21.     After the Norris Companies spent weeks providing documents and securing (and paying for) third-party reports such as appraisals on both properties, environmental and other reports, Mr. Jhaveri informed them that the Bank would now require not only an increase in the interest reserve escrow (from $85,000 as shown in the Approval Letter to $125,000) but escrows for predevelopment and working capital (about $210,000). On or about May 29, 2013, as a condition of settlement, Mr. Jhaveri and the Norris Companies negotiated and agreed to a list of expenses (the "Budget") that Eagle would fund monthly to be drawn from escrow accounts (the "Draws").

5

22.     The parties approved these expenses, and neither Mr. Norris, nor the Norris Companies, would have entered into the Loan without a firm agreement that there would be funds available to pay for development, working capital, or interest expenses.

23.     After negotiating the escrows, the Bank then informed the Norris Companies that the loan term would be reduced from 24 months (as stated in the Approval Letter and Term Sheet) down to 18 months.

24.     In addition, if the BC Property were sold to a church, the Bank had previously agreed on May 7, 2013 that the "collateral release" pay-off would be $630,657 paid to ECV to release the BC Property. *See* Term Modification/Collateral Release, attached and incorporated by reference as **EXHIBIT 3**.

25.     However, three weeks later, On May 30, 213, the Bank reversed its position and informed that if the BC Property were sold, the Bank would keep 100 percent of the sales proceeds (about $1.5 million as opposed to $630,657).

26.     The Norris Companies had no alternative but to accede to ECV's ever-changing demands.

## III.    The Loan

27.     After considerable negotiations, in June of 2013, the Norris Companies closed on a loan in the amount of $1,483,877 (the "Loan"). At closing, ECV reduced the term of the loan from 18 months to 17.5 months.

28.     In broad strokes, ECV disbursed $1,150,813 at settlement and the remainder was withheld at closing by ECV for expenses to be paid in draws and interest reserves.

29.     Specifically, at closing, as reflected on the Settlement Statement (HUD-1), $449,813.18 was paid to the first trust lien holder (4D Associates, LLC) to refinance existing

debt on Burtonsville Crossing, LLC and $442,797.61 to refinance existing debt on ElderHome Land, LLC. Assorted title charges, recordation, transfer and other miscellaneous fees were paid, and a sum of $333,064 was categorized on the Settlement Statement as "Escrow Holdback." *See* Settlement Statement (HUD-1), attached and incorporated by reference as **EXHIBIT 4**.

### A. The Escrows

30.     ECV represented that the "Escrow Holdback" funds were placed in three deposit accounts at the Bank (collectively, the "Deposit Accounts"), which were assigned by Borrowers to ECV subject to distribution/payment on certain conditions being met.

31.     As reflected in the closing documents, the Deposit Accounts were titled: 1) Pre-Development Reserve (having Account No. 5334978472); 2) Interest Reserve (having Account No. 5300383205); and 3) Development Fee Reserve (having Account No. 5300896851).

32.     The Developer Fee Reserve, a restricted deposit account (*i.e.,* prohibiting withdraw without "prior written consent of [ECV] in its sole discretion") was to be funded with $75,000 from the Loan proceeds, designed to pay fees in the amount of $4,166.67 per month to ElderHome Land, LLC. *See* Assignment of the Developer Reserve Account, attached and incorporated by reference as **EXHIBIT 5**. In essence, the Developer Fee Reserve was designed to provide monthly compensation to the Norris Companies for shouldering the burden of undertaking the development of the Project. Moreover, Paragraph 5 of the Developer Fee Assignment clearly states that in the event the Loan is paid in full, then "any remainder" will be "paid over to the Assignor" (*i.e.*, Borrowers).

33.     The Interest Reserve, a similarly restricted escrowed, deposit account, was designed to pay the current interest on the loan at a six percent rate specified in the Deed of

Trust Note. This monthly payment, which could only be drawn by ECV, was contractually to be paid on the principal balance that had been partially funded. *See* Assignment of Deposit Account (Interest Reserve), attached and incorporated by reference as **EXHIBIT 6**. ECV was to fund the Interest Reserve with $125,000 withheld at closing and represented that the monthly interest rate (*i.e.,* six percent) would be deducted each month from this sum by the Bank. The document clearly states that "the Assignor [Borrowers] shall not withdraw any funds from the Account without the prior written consent of the Assignee [Bank], in its sole discretion."

34.     The Pre-Development Reserve, as with the other two escrowed deposit accounts,[1] was restricted and was to be paid based on "requisitions for advances" for "third party pre-development and associated administrative cost all in accordance with a budget acceptable to Lender in its sole discretion . . ." *See* Assignment of Pre-Development Reserve Account, attached and incorporated by reference as **EXHIBIT 7**. The Pre-Development Reserve was funded with $133,063.82, and the Bank agreed and represented that Draws would be disbursed to the Norris Company in conjunction with the Budget over the course of 18 months. As with the other two escrow accounts, according to ¶5, the document clearly states that in the even the loan is paid in full, then "any remainder" will be "paid over to the Assignor [Borrowers]."

**B.     The Note**

35.     The Loan Documents also included a Deed of Trust Note (the "DOT Note") governing the assessment of interest over the term of the loan. The DOT Note set forth:

---

[1]     Each of the Assignments requires the Norris Companies to effectuate service by delivering a copy of the summons and complaint "...to the Embassy of Chad in the United States..." *See id.* at ¶ 16.

. . . [I]nterest shall accrue at a rate of fourteen percent (14%) per annum (the "Annual Rate") and the principal and said interest shall be as follows:

    (a)    Beginning on July 14, 2013, and continuing [monthly] thereafter so long as this Note is outstanding, accrued interest computed at the rate of eight percent (8%) per annum (the "Accrual Rate"), shall accrue and be added to the principal balance; and

    (b)    Beginning on July 14, 2013 and continuing [monthly] thereafter so long as this Note is outstanding the unpaid principal balance and accrued interest computed at the rate of six percent (6%) per annum (the "Payment Rate"), shall be due and payable. . .

The loan maturity date for the loan was December 1, 2014 (*i.e.,* 17.5 months after the date of execution). Under the terms of the DOT Note, however, "[the Norris Companies] shall have the option of extending the Maturity Date for one period of six (6) months," provided that the borrowers were not in default and proper notice was given. That extension, if applied for and granted, would make the Loan due on June 1, 2015. *See* DOT Note, attached and incorporated by reference as **EXHIBIT 8**.

## C.    The Guaranty

36.    As a condition of the Loan, ECV required Thomas Norris, personally, to execute a Guaranty of Payment and Performance (the "Guaranty"). The Guaranty set forth a disclaimer that "[n]othing contained in the Guaranty shall be construed in a manner to create any relationship between the Guarantor and the Lender other than the relationship of guarantor and lender, and the Guarantor and the Lender shall not be considered partners or co-venturers for any purpose whatsoever." ¶ 15. *See* Guaranty, attached and incorporated by reference as **EXHIBIT 9**.

## IV.    Bank Errors Begin

37.    On or about July 15, 2013, Mrs. Norris received the Bank's first monthly Loan Statement, dated July 3, 2013, which reflected the first month of interest paid, among other information.

38.    To the Bank's advantage, the July Loan Statement contained several miscalculations:

      a.    The monthly interest payment was calculated on the full loan total of $1,483,977, which included the undisbursed escrowed funds of $333,064. The contractual terms of the DOT Note, however, permit interest on only the **unpaid principal balance**, upon which monthly interest payments would not include escrowed/undisbursed monies not yet drawn or paid.

      b.    The interest was not pro-rated for the month of June and therefore did not account for the fact that settlement did not take place until mid-June (*i.e.*, June 14, 2103).

      c.    The Bank incorrectly applied the eight percent Accrual Rate in calculating the interest, which was due upon loan payoff, rather than the six percent Payment Rate, as required under the DOT Note.

      d.    The "current balance" was stated as $1,483,977, rather than the correct $1,150,813.18, which was the actual amount disbursed at settlement.

*See* July 3, 2013 Loan Statement, attached and incorporated by reference as **<u>EXHIBIT 10</u>**.

39.    As a result of these compounded errors, interest was assessed at $9,892.51, rather than the correct $5,754.07.

40. When Mrs. Norris apprised the Bank of its errors, the Bank agreed and repeatedly stated that these would be corrected.

41. This was not accomplished, however, setting in motion a cascade of follow-on errors moving forward, including prematurely exhausting the Interest Reserve Account.

42. One year later, after routinely paying twelve monthly development draws from the Escrow Accounts, on or about June 2014, the Bank refused to fund Draw #13, even though:

    a. the Loan was not in default;

    b. both parties had negotiated and agreed to the 18-month Budget and disbursement schedule prior to Loan Closing;

    c. the Escrow Accounts had ample funds from which to draw, and

    d. the loan maturity date was more than six months away.

43. On or around November 26, 2014, ECV represented that the Interest Reserve Account had been depleted. In an e-mail, Mr. Jhaveri, on behalf of ECV, stated that:

> Looks like the interest reserve is nearly depleted and will not be enough to cover interest for this last period (prior to maturity and the extended term). That being said, we can fund a portion of the interest from the reserve and the rest will be out of pocket. I can get exact numbers shortly.

*See* November 26, 2014 Email from Mr. Jhaveri to the Norris Companies, attached and incorporated by reference as **EXHIBIT 11**.

44. Four days later, on December 1, 2014, the Bank informed the Norris Companies that in order to exercise the six-month extension, the Plaintiffs must replenish the interest reserve fund with $104,000 for the six-month period, a vast overstatement of the interest payment due.

45.     Ultimately, after numerous discussions of the amounts available and evidence offered by the Norris Companies of the interest that would actually accrue during this period, the Bank lowered its demand from $104,000 to $25,000 to $10,000. However, the Bank dangled the fate of the Loan over the heads of the Norris Companies, threatening to declare the Loan in default if the $10,000 was not paid.

46.     On December 19, 2014, Plaintiffs paid the Bank $10,000 and the Loan was extended.

47.     Meanwhile, the Norris Companies searched for a suitable joint venture partner to assist them in developing the project.

## V.     The Bank Tries to Take Control of the Wheel

48.     In early 2015, after several months of negotiations, the Norris Companies selected Hamister Group, LLC ("Hamister"), a Buffalo, New York-based business that owns and manages hotel and healthcare businesses, and which was looking to expand into the Maryland market.

49.     In February 24, 2015, the Norris Companies informed the Bank of their decision to select Hamister.

50.     The next day, ECV demanded that the Norris Companies introduce ECV to Hamister.

51.     In fact, Mr. Jhaveri insisted on speaking to Hamister directly.

52.     In March 2015, the Norris Companies and Hamister entered into a Memorandum of Understanding, which the Norris Companies forwarded to Mr. Jhaveri after the Bank insisted on receiving a copy. On April 8, 2015, Hamister and the Norris Companies executed an agreement with a broker to obtain long-term financing for the

12

"Hamister/ElderHome Joint Venture for Assisted Living Projects," which identified not only financing for the current project, but future assisted living projects as well.

53.     Mr. Jhaveri stated that he wanted to meet Hamister in person "as soon as possible." *See* April 7, 2015 Email from Jhaveri to the Norris Companies, attached and incorporated by reference as **EXHIBIT 12**. He also wanted Ryan Riel, Executive Vice President, and Tony Marquez, Senior Executive Vice President, at The Bank to meet with Hamister. *Id.*

54.     On or about May 13, 2015, the Norris Companies introduced ECV to Hamister at a dinner meeting hosted by ECV.

55.     At the meeting, the parties discussed creating a new joint venture between the Norris Companies and Hamister. As part of this arrangement, ECV and the Bank represented that they would refinance the existing Loan into a $10 million development fund, including an interest reserve, with a five percent interest rate. This would fund not only the current project but land acquisition and development for three additional projects (Edgewater, Annapolis and Catonsville) that the Norris Companies had already placed or planned to place under contract pursuant to discussions with Eagle and Hamister.

56.     ECV stated that this new loan transaction would be completed before the extended maturity date of June 1, 2015.

57.     On May 14, 2015, the day after the dinner meeting, Mr. Jhaveri emailed the Norris Companies and David Paul, the senior vice president of Hamister. Th e-mail stated that ECV "would love to have" a "collective relationship" with the Norris Companies and Hamister. *See* May 14, 2015 Email from Jhaveri to the Norris Companies, attached and incorporated by reference as **EXHIBIT 13**.

13

58.     ECV indicated it was "anxious and excited to get this relationship started." *Id.*

59.     One week later, on May 21, 2015, ECV informed the Norris Companies that "the Loan is "past due" even though the Loan had been properly extended until June 1, 2015. *See* May 21, 2015, Email from Jhaveri to Norris Companies, attached and incorporated by reference as **EXHIBIT 14**. In addition, Mr. Jhaveri represented that he was working on a "short term extension" and "only $1,008.96 is remaining" in the escrow account, which the Norris companies later learned was inaccurate.

60.     The June 1, 2015 extended maturity date and the date by which Mr. Jhaveri said that ECV would be prepared to begin a new financing arrangement with the Norris Companies and Hamister, passed without any word from Eagle.

## VI.     The Bank Steers and Controls

61.     Unbeknownst to the Norris Companies, ECV independently extended the Loan again on or about June 23, 2015 (the "Second Extension"). Even though the Norris Companies had not requested another extension ECV advised the Norris Companies that it was unilaterally filing a 90-day extension and imposing an extension fee of $3,709.69.

62.     Ironically, even though Mr. Jhaveri said he did not want to create any "surprises," another ECV representative told the Norris Companies three days later on June 26, 2015, that the extension fee, document preparation fee, and interest totaled $12,058.51, over three times higher than the value initially given by ECV.

63.     In reliance on ECV's apparent commitment to fund the joint venture, and under extraordinary pressure from the Bank, the Norris Companies paid the extension fee and, per ECV's instructions, backdated the paperwork to June 1, 2015.

64.     In July 2015, after weeks of waiting for Eagle to fund the joint venture and Hamister to sign the final joint venture documents, the Norris Companies informed ECV that they could not wait any longer as ECV was charging interest while this delay was ongoing. Mr. Norris informed the Bank that he had found a different potential joint venture partner and desired to cancel further discussions with Hamister and wanted to move the project forward.

65.     In response, ECV directed the Norris Companies to wait, because ECV was in the process of fine tuning the details of the potential ElderHome-Hamister joint venture.

66.     In subsequent communications, the Bank repeatedly advised the Norris Companies to remain with Hamister and stand down until they had completed their negotiations.

67.     Unbeknownst to the Norris companies at this time, Eagle was secretly communicating with Hamister and discussing purchasing and financing other projects in Maryland, without the Norris Companies' involvement.

68.     As the new maturity date of September 1, 2015, approached, the Norris Companies became increasingly worried that a joint venture with Hamister would never materialize, despite the Bank's direction to continue working with Hamister. As a result, the Norris Companies resumed their search for a new partner.

69.     On September 1, 2015, the Norris Companies relayed to the Bank that two other joint venture partners were interested in the project. The Bank, again, directed the Norris Companies to not proceed with any potential joint venturers other than Hamister.

70.     Two weeks later, there was still no sign that ECV would fund the new joint venture with Hamister as agreed almost four months earlier at the May 13, 2015, dinner meeting.

71.     On September 15, 2015, Mr. Jhaveri emailed the Norris Companies, asking form more funds to place in the escrow accounts. He stated that ECV seeks payment "asap" because the Escrow Accounts had been depleted for months and that the Norris Companies were behind "three months" on their interest payments, which statements were incorrect, as the Norris Companies would later learn.

72.     It was not until the date of this email, September 15, 2015, that ECV made the Norris Companies aware of the fact that these accounts allegedly lacked sufficient funds and that they were "three months behind."

73.     ECV did not provide any bank statements (monthly, quarterly or otherwise) for any of the escrow accounts. The only way the Norris Companies would know the balance remaining in these accounts was through the Bank's representations.

74.     Notwithstanding the Norris Companies' protests that there should be funds in the escrow account, the Bank demanded payment of $22,257.90 for "past due interest" and a late fee of $741.94. *See* September 15, 2015 Email from ECV to Norris Companies, attached and incorporated by reference as **EXHIBIT 15**.

75.     Once again, the Bank incorrectly calculated the interest using the total amount of the loan instead of the amount actually disbursed to the Norris Companies, pursuant to the DOT Note.

76.     As he had done before, Mr. Jhaveri attempted to soften the blow by reassuring the Norris Companies that the Norris Companies that payment of these charges would bring the account current, that he would file an extension of the Loan upon receipt, and that the Norris Companies would be reimbursed from the new loan.

77.     In reliance on these representations, the Norris Companies paid ECV $22,999.84.

78.     On September 28, 2015, Mr. Jhaveri told the Norris Companies that, after speaking with Hamister, "everything [will be] wrapped up this week." *See* September 28, 2015 Email from Jhaveri to the Norris Companies, attached and incorporated by reference as **EXHIBIT 16**.

## VII.    Pretextual "Default"

79.     On September 30, 2015, after cashing the Norris Companies' checks totaling $22,999.84, ECV mailed a default letter, claiming that the Loan matured on September 1, 2015.

80.     Mr. Jhaveri had omitted mention in any of his prior e-mails of an upcoming default.

81.     Upon receipt of the Default Letter in the mail a few days later, the Norris Companies were stunned, as the Letter completely contradicted the Bank's previous statement that if the Norris Companies paid $22,999.84, they would avoid a default.

82.     The September 30, 2015 Default Letter is replete with inaccuracies:

    a.  The payoff of $1,862,642.86 is highly overstated. This is evidenced by a letter from ECV on October 30, 2015, in which ECV, after consulting with its external auditor, states that the balance of the Loan on October 30, 2015, was $1,483,877.

    b.  The interest owed of $289,770.23 is incorrect and contradicted by ECV's statements made in an e-mail two weeks earlier on September 15, 2015, that $22,257.90 was owed for interest (plus $741.94 for late fees, totaling $22,999.84).

17

c. The $88,995.63 assessed in "late charges" has no basis in any of the Loan Documents and contradicts Eagle's own monthly loan statements, the October 30, 2015, external auditor figure, and other documents. The Loan is interest-only, with an Interest Reserve escrow in place, and the Norris Companies were not required to make monthly payments except to the extent to replenish the Interest Reserve escrow, if depleted. Further, a subsequent loan statement dated October 21, 2015, show lates charges of only $1,112.91, not $88,995.63 as shown in the Default Letter dated September 30, 2015.

d. The principal amount shown of $1,483,877 had not been fully disbursed.

e. ECV failed to deduct in their "outstanding balance" calculations the balance of the three escrow accounts deposited at Eagle Bank totaling $333,063.82 withheld by ECV at loan closing.

*See* September 30, 2015 Default Letter, attached and incorporated by reference as **EXHIBIT 17**.

## VIII. Bank Refuses to Work with JV Replacement

83.    Increasingly frustrated with the actions of ECV, the Norris Companies informed ECV on October 7, 2015, that they no longer wished to work with Hamister and had selected Milestone Retirement Communities, LLC ("Milestone") as a replacement.

84.    One week later, on October 14, 2015, ECV told a representative of Milestone that ECV was willing to fund a new project loan between the Norris Companies and Milestone.

85.    The Bank also assured Milestone that the default letter was "standard procedure and [ECV] do[es] not have any specific deadline for payment."

18

86.     Paradoxically, it was clear that the Bank wanted to work with Hamister and felt that they should be the Norris Companies' joint venture partner. That same afternoon, on October 14, 2015, Mr. Jhaveri called Don Atchison, a representative of Hamister's broker, and informed him that "Hamster's involvement would be just what is needed to put the loan in good standing" and that "they [Eagle] should be comfortable (obviously depending on the structure and details of the JV" in moving forward." *See* October 14, 2015 Email from Jhaveri to Don Atchison, attached and incorporated by reference as **EXHIBIT 18**. The e-mail also revealed that, unbeknownst to the Norris Companies, Eagle was trying to finance a new project for Hamister in Bel Air, Maryland. *Id.*

87.     In communications between representatives of Milestone and Eagle on October 23, 2015, Eagle agreed to forbear the alleged default of the Loan until the end of the year to allow time for all parties to complete joint venture paperwork with Milestone and set up development financing.

88.     However, a month later, on November 12, 2015,[2] Eagle filed complaints for confessed judgment in the Circuit Court for Montgomery County, Maryland against the Norris Companies and Mr. Norris.

89.     On November 20, 2015, the Court entered a confessed judgment order against the Norris Companies and Mr. Norris in the amount of $1,917,385, in addition to $600 in attorneys' fees. *See* November 20, 2015, Order, attached and incorporated by reference as **EXHIBIT 19**.

---

[2]     Four days later, on November 16, 2015, Hamister closed on a 92-bed assisted living facility in Forest Hill, Maryland, via a loan of $10 million from Buffalo, New York, lender.

90.     Several days later, Mr. Norris, on behalf of himself and the Norris Companies, wrote to ECV to request a forbearance until February 28, 2016. *See* November 24, 2015, Letter from T. Norris to ECV, attached and incorporated by reference as **EXHIBIT 20**. In this letter, Mr. Norris underscores the viability of a joint venture project between the Norris Companies and Milestone, who together entered into a joint venture agreement. *Id.*

91.     Finally, in December 2015, ECV agreed to meet with the Norris Companies and a representative of Milestone.

92.     At this meeting, which took place on December 17, 2015, at the Bank's headquarters in Bethesda, Maryland, the Bank abruptly reversed course, telling the parties that it was no longer offering financing for senior housing projects.

93.     Needless to say, the venture between Milestone and the Norris Companies never materialized.

IX.     **Forbearance No. 1**

94.     On December 29, 2015, Janice Williams ("Ms. Williams"), the Bank's chief credit officer, immediately called Mr. Norris and requested that Mr. Norris meet her at the Bank's headquarters the next day because she believed that the parties could secure a workout agreement.

95.     On December 30, 2015, Mr. Norris met with ECV as requested. The Bank presented Mr. Norris with a forbearance agreement (the "Forbearance Agreement"). ECV agreed to vacate the $1.9 million judgment against the Norris Companies and Mr. Norris, extend the Loan six months to June 1, 2016, readjust the outstanding balance of the Loan from $1,917,385.54 (as suggested in the confessed judgment action) to $1,483,877, add $50,000 to the existing interest reserve escrow to cover the six-month extension, and waive all accrued

interest (at eight percent), default interest, late charges, the exit fee, attorneys' fees, court costs and other related expenses.

96.     The next day, December 31, 2015, on New Year's Eve, at approximately 10:49 am, ECV demanded that the Norris Companies sign and return the Forbearance Agreement by 2:00 pm that same day. *See* December 31, 2015 Email from J. Williams to T. Norris, attached an incorporated by reference as **EXHIBIT 21**.

97.     With less than 24-hours' notice, and on the heels of ECV's stunning refusal to fund the joint venture with Milestone, the Norris Companies had no real option but to execute the Forbearance Agreement on December 31, 2015. *See* December 31, 2015 Forbearance Agreement, attached and incorporated by reference as **EXHIBIT 22**.

98.     Over the course of the next several months, the Norris Companies repeatedly attempted to refinance the Loan with other lenders. However, the Bank refused to furnish the necessary payoff information, torpedoing these refinancing proposals in the process.

**X.     The Bank interferes with Another Payoff Attempt**

99.     On or about May 9, 2016, 23 days prior to the extended maturity date of June 1, 2016, and without raising allegations of a "new default" as defined in the Forbearance Agreement, ECV yet again declared the Loan in default (the "2016 NOD"). *See* May 9, 2016 Notice of Default and Demand for Payment, attached and incorporated by reference as **EXHIBIT 23**.

100.    The 2016 NOD falsely claimed that the Loan is "currently fifty-six (56) days past due" and demanded payment in full of $11,206.37 by May 26, 2016. *Id.*

101.    In an effort to refinance the Loan through a local lender, Mr. Norris requested a payoff from ECV on May 16, 2016, which was, again, ignored.

102. On May 26, 2016, Mr. and Mrs. Norris hand-delivered a check to ECV for $11,206.37 as ECV reiterated that this payment would avoid acceleration of the Loan. The check was cashed shortly afterwards.

103. While the Norris Companies procured a refinancing lender to pay off the Loan, Eagle continued to stonewall any refinancing attempts by failing to provide a payoff.

104. Finally, the Bank issued a payoff on June 22, 2016, 22 days after the maturity date of June 1, 2016, falsely claiming that the payoff amount as of June 22, 2016, was $1,931,602.47. *See* June 22, 2016 Payoff, attached and incorporated by reference as **EXHIBIT 24**. This figure was $447,725.47 higher than the amount represented by the Bank at the December 31, 2015 meeting.

105. As a result of the unexpected discrepancy between ECV's June 22, 2016 payoff amount and the lesser amount in the May 14, 2016 Statement, as well as what was contained in the December 31, 2015 Forbearance Agreement, the refinancing lender refused to move forward until the issue with the Bank was resolved.

106. With the refinancing lender out of the picture, the Bank issued various pay-off amounts and gradually reduced the amount of the unpaid balance.

107. For example, a subsequent loan statement dated October 3, 2016, shows the unpaid amount of the Loan as of June 1, 2016, as $1,848,909.56. *See* October 3, 2016 Loan Statement, attached and incorporated by reference as **EXHIBIT 25**.

108. Further, in an October 31, 2016, letter from ECV to the Norris Companies, ECV significantly reduced the unpaid "10/31/2016 balance" by hundreds of thousands of dollars to $1,533,877.00, as verified by ECV's external auditor. *See* October 31, 2016, Letter from ECV to Norris Companies, attached and incorporated by reference as **EXHIBIT 26**.

22

## XI.     Foreclosure, Potential Joint Venturer, and Forbearance No. 2

109.     On January 20, 2017, the Bank initiated foreclosure proceedings against the properties collateralized by the Loan.

110.     On February 9, 2017, Meridian Senior Living, LLC ("Meridian") approached the Norris Companies to express an interest in forming a joint venture with the Norris Companies.

111.     On April 20, 2017, the Norris Companies and Meridian entered into a letter of intent.

112.     In May 2017, Meridian drafted additional venture documents, which state that Meridian would, among other things, pay approximately $2.2 million to Eagle to pay off the Loan.

113.     Given the prospect that Meridian could pay off the Loan, Eagle sent another forbearance agreement to the Norris Companies on June 28, 2017 (the "2017 Forbearance"). *See* June 28, 2017 Forbearance Agreement, attached and incorporated by reference as **EXHIBIT 27**. Under the 2017 Forbearance, the Loan would be extended until September 12, 2017. *Id.*

114.     Eagle gave the Norris Companies less than one hour to review the 2017 Forbearance – the document was sent for signature at 4:46 pm and Eagle threatened to resume foreclosure proceedings if the agreement was not signed by 5:30 pm that same day.

115.     Again, having no other reasonable choice, the Norris Companies signed the 2017 Forbearance and paid a $12,759.45 fee to Eagle.

116.     Unexpectedly, on September 2, 2017, 10 days before the expiration of the date set out in the 2017 Forbearance, Meridian backed out of their joint venture agreement with the Norris Companies.

**XII.     Foreclosure, Bankruptcy, and Payoff**

117.     On October 12, 2017, the Bank resumed foreclosure proceedings on properties collateralized by the Loan.

118.     On December 15, 2017, the Norris Companies filed for chapter 11 bankruptcy protection.

119.     On February 2, 2018, Eagle filed a proof of claim, claiming the Norris Companies owed $2,183,243.70. *See* Proof of Claim, attached and incorporated by reference as **EXHIBIT 28**.

120.     In April 2018, the Norris Companies, once again entered into an agreement with another lender to refinance the project and pay off the Bank's loan.

121.     Although the Norris Companies disputed the amount sought by the Bank, they paid ECV its full requested payoff of $2,250,000 on May 22, 2018 in order to resume progress on the Project.

**XIII.     Discovery of Concealed Bank Accounts**

122.     In January 2019, Plaintiffs received two 1099-INT forms from the Bank, each addressed to Burtonsville Crossing, LLC, for the year 2018. *See* 1099 Forms, attached and incorporated by reference as **EXHIBIT 29**.

123.     One of the accounts (No. 0537176405500002) had earned interest income of $323.23 for the year 2018. *Id.* The other (No. 0530038320500001) earned $3.71 for 2018.

124. The Norris Companies had not received any 1099-INTs for interest income earned for any of the escrow accounts for the years 2013, 2014, 2015, 2016 or 2017.

125. Upon information and belief, the Bank had been holding $50,042.68 and hiding it form the Norris Companies, between these two concealed bank accounts, even as the Bank repeatedly advised the Norris Companies that the escrowed funds were depleted.

126. After discovering these accounts, the Norris Companies contacted the Bank for an explanation.

127. An employee of the Bank's Rockville branch admitted to Mrs. Norris that all bank statements and other correspondence had been "suppressed" in the Bank's computer system, which meant that no mailings were to be forwarded to the Norris Companies.

128. The Bank could not offer any reason as to why the account was suppressed.

129. Even though these accounts held significant sums, Eagle failed to deduct the $50,042.68 from its previous payoff amounts, the proof of claim filed in the bankruptcy court, default or demand letters, or monthly loan statements sent to the Norris Companies. Further the Bank failed to account for these escrows in the letters showing balances issued by their external auditors dated October 15, 2015, and October 31, 2016. To the contrary, the Bank repeatedly claimed, since 2014, that each of the Norris Companies' escrow accounts had been completely depleted.

## COUNT ONE
## BREACH OF CONTRACT

130. Plaintiffs incorporate by reference Paragraphs 13 through 129 as if fully set forth in this Paragraph.

131. The Bank breached its fundamental contractual obligations under the Loan Documents by:

    a. calculating the monthly interest payment based on the full amount of the Loan, including escrowed funds;

    b. failing to prorate interest for the month of June 2013 since settlement occurred on June 14, 2013;

    c. refusing to fund the Norris Companies' draws beginning in June 2014.

132. Further, the Bank breached the Loan Documents' implied covenant of good faith and fair dealing by preventing the Plaintiffs from receiving the full benefits of the Loan. By way of example, the Bank steered the Norris Companies to work with a particular joint venture partner over the objection of the Norris Companies even though the Guaranty explicitly states that the relationship between the Bank and the Norris Companies was to be only that of a borrower and a lender. The Bank wrongly refused to pay the Developer Fee beyond the first 12 months of the Loan, caused refinancing lenders to withdraw their offers to pay off the Loan by supplying grossly erroneous payoff amounts, took premature actions to collect on the Loan and wrongly declared it to be past due 23 days prior to the extended maturity date of June 1, 2016, and concealed approximately $50,000 from the Norris Companies as the Bank repeatedly represented that all of the escrow accounts had been depleted. As a result, the Norris Companies were denied the contractual benefits promised by the Bank in the Loan Documents.

133. The Plaintiffs performed all conditions precedent under the Loan Documents and were ready, willing, and able to perform under those Documents.

WHEREFORE Plaintiffs ElderHome Land, LLC, Burtonsville Crossing, LLC, and Thomas A. Norris demand judgment against Defendants Eagle Commercial Ventures, LLC, EagleBank, and Eagle Bancorp, Inc. in an amount to be proven at trial in excess of $75,000, pre-and post-judgment interest, costs, and such other relief as this Court deems appropriate.

## COUNT TWO
## MISREPRESENTATION

134.    Plaintiffs incorporate by reference Paragraphs 13 through 129 as if fully set forth in this Paragraph.

135.    On multiple occasions, the Bank asserted false representations of material facts to the Norris Companies when the Bank either knew of, or recklessly disregarded, the truth behind those statements. These representations were made for the purpose of defrauding the Plaintiffs.

136.    Specifically, without revealing their true intentions, the Bank strung the Norris Companies along for years and encouraged the development of the Loan's collateral for the nefarious purpose of allowing the collateral's value to rise, at which point the Bank intended to declare a default and seize an equity stake in the valuable collateral.

137.    To entice the Norris Companies into entering this scheme, the Bank made a multitude of false representations of material facts.

138.    At nearly every stage, the Bank incorrectly stated balances, interest payments due, and payoff amounts in order to discourage Plaintiffs from exiting the relationship.

139.    For example, the Bank promised the Norris Companies that they would be compensated $4,411.76 per month over the life of the Loan. In reality, the Bank refused to

transfer these funds to the Norris Companies after 12 months, leaving the Norris Companies cash-strapped.

140. Then, on December 1, 2014, the Bank demanded that the Norris Companies pay a grossly overstated interest payment of $104,000, when in fact the Bank needed only $10,000.

141. Nearly two years after the Loan had been entered into, when the Norris Companies secured an agreement with Hamister to be a joint venture partner, the Bank represented that the Loan would be refinanced prior to the extended maturity date of June 1, 2015. But the Bank reneged on the promise and demanded that the Norris Companies pay an extension fee even though no extension was requested, and, despite months of delays, belatedly directed the Norris Companies to choose Hamister. Meanwhile, the Bank incorrectly declared the Norris Companies to be "three months" in arrears on interest payments for the period that the Bank had directed the Norris Companies to pause their search for a joint venture partner.

142. Unbeknownst to the Norris Companies at the time, the Bank actually had access to at least $50,000 in uncommitted, escrowed funds that could have been used to fund the interest reserve or could have been disbursed monthly as developers' fees and predevelopment Budget item costs. Rather than transferring money from these accounts, the Bank demanded $22,257.90 in interest, which (again) was incorrectly calculated using the wrong interest rate.

143. The day after the Bank cashed the Norris Companies' check containing the amount of allegedly past due interest, the Bank issued a default letter and claimed that the Loan matured on September 1, 2015. Once again, the default letter contained incorrect calculations, including a wildly inflated interest amount of $289,770.23 when, two weeks earlier, the Bank had claimed that only approximately $22,000 was owed in interest. The Bank also assessed

dubious "late charges" of $88,9945 that had no basis in any of the Loan documents. Because the Loan was interest only, the Norris Companies were not required to make monthly payments except in regard to interest that was deducted, which was under the Bank' immediate control. In a statement dated October 21, 2015, the Bank belatedly reduced the late charges to $1,112.91, evidencing the arbitrariness of the Bank' behavior and their disregard of the fundamental purposes of the Loan.

144.    After obtaining a confessed judgment against the Norris Companies, the Bank then represented that they were willing to forbear the default of the Loan due to the presence of the Norris Companies' new potential venture partner, Milestone. This turned out to be untrue as well. One month after these representations, the Bank told the Norris Companies that they were no longer offering financing for senior housing projects.

145.    As explained above, in the subsequent months, the Bank provided overstated payoff information to potential refinancing lenders, which further hindered the Norris Companies' abilities to refinance and move forward with the Project.

146.    The Bank resumed their wrongful foreclosure proceedings against the collateral on October 12, 2017, over four years after the initiation of the Loan.

147.    The Norris Companies justifiably relied on the Bank' representations. For example, on multiple occasions, the Norris Companies paid allegedly past due interest, entered into forbearance agreements, and heeded to the Bank' commands to wait for Hamister.

148.    The Norris Companies have suffered damages as a direct result of their reliance upon the Bank' misrepresentations.

WHEREFORE Plaintiffs ElderHome Land, LLC, Burtonsville Crossing, LLC, and Thomas A. Norris demand judgment against Defendants Eagle Commercial Ventures, LLC, EagleBank, and Eagle Bancorp, Inc. in an amount to be proven at trial in excess of $75,000, punitive damages, pre-and post-judgment interest, costs, and such other relief as this Court deems appropriate.

## COUNT THREE
## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ADVANTAGE

149. Plaintiffs incorporate by reference Paragraphs 13 through 129 as if fully set forth in this Paragraph.

150. The Bank engaged in an intentional and willful pattern of false and misleading statements and conduct tending to not only frustrate the Norris Companies in fulfilling their stated objectives of developing the Property and securing a joint venture partner, but to preclude the Norris Companies from obtaining alternative financing when their relationship with the Bank became untenable.

151. The Bank, at various times, knowingly and deliberately misstated the Loan's payoff amount, thwarting efforts to refinance.

152. As a result of the Bank's conduct, which was calculated to damage the Norris Companies, these parties could not obtain replacement financing and were ultimately forced to seek bankruptcy protection when the Bank wrongfully declared a default and sought to collect on the collateral pledged for the Loan.

153. Among other harms, the Bank's intentional conduct caused a substantial delay in the overall timeline of the Project, which was expected to move into the construction phase

in December 2014. The delay arising from this unwarranted action by the Bank caused significant damages to Plaintiffs.

154. The Bank also interfered with the Norris Companies' ability to contract with Hamister for the purposes of acquiring and developing three additional projects (Edgewater, Annapolis and Catonsville) that the Norris Companies had already placed or planned to place under contract pursuant to discussions with the Bank and Hamister.

155. The Bank's wrongful conduct as set forth in this Complaint was undertaken with the unlawful or improper purpose causing harm to the Norris Companies, was without justification, and has in fact caused damage to the Norris Companies.

WHEREFORE Plaintiffs ElderHome Land, LLC, Burtonsville Crossing, LLC, and Thomas A. Norris demand judgment against Defendants Eagle Commercial Ventures, LLC, EagleBank, and Eagle Bancorp, Inc. in an amount to be proven at trial in excess of $75,000, punitive damages, pre-and post-judgment interest, costs, and such other relief as this Court deems appropriate.

## COUNT FOUR
## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

156. The Norris Companies incorporate by reference Paragraphs 13 through 129 as if fully set forth in this Paragraph.

157. The Bank knew the Norris Companies had entered into joint venture contracts with Hamister, Milestone, and Meridian.

158. With regard to Hamister, the Bank knew the Norris Companies had already placed or planned to enter into contracts for the acquisition and development of projects in Edgewater, Annapolis, and Catonsville, Maryland.

159.    The Bank intentionally and improperly induced or otherwise rendered it impossible for Hamister, Milestone, and Meridian to perform under these contracts.

160.    Hamister, Milestone, and Meridian subsequently breached or were unable to perform under these contracts because of the Bank' interference.

161.    The Norris Companies have suffered damages resulting from the breach or non-performance of these contracts.

WHEREFORE Plaintiffs ElderHome Land, LLC, Burtonsville Crossing, LLC, and Thomas A. Norris demand judgment against Defendants Eagle Commercial Ventures, LLC, EagleBank, and Eagle Bancorp, Inc. in an amount to be proven at trial in excess of $75,000, punitive damages, pre-and post-judgment interest, costs, and such other relief as this Court deems appropriate.

## COUNT FIVE
## NEGLIGENT MISREPRESENTATION

162.    Plaintiffs incorporate Paragraphs 13 through 129 as if fully set forth in this Paragraph.

163.    The Bank owed a duty of care to the Plaintiffs to timely transmit accurate, honest, and correct information concerning the Loan.

164.    The Bank negligently and falsely asserted many representations, as noted *supra*. For example, the Bank used the incorrect interest calculation in many of its statements and demands, declared the loan to be "past due" on May 21, 2015, even though the Loan had been extended until June 1, 2015, used incorrect amounts in its September 28, 2015, default letter, wrongfully declared the loan in default on May 9, 2016, 23 days prior to the maturity date

under the operative forbearance agreement, and failed to disclose the presence of at least $50,000 in available escrowed funds.

165.    The Bank intended for the Norris Companies to act or rely upon its negligent assertions, and threatened to, and did in fact, declare the Loan in default if the Norris Companies did not pay on the Bank' terms.

166.    The Bank knew that its customers, the Norris Companies, would likely rely upon these negligent assertions and that they were, in fact, relying upon these negligent statements.

167.    The Norris Companies justifiably acted in reliance on these representations.

168.    As a result of the Bank's negligent misrepresentations, the Norris Companies have suffered damages proximately caused by The Bank' negligence.

WHEREFORE Plaintiffs ElderHome Land, LLC, Burtonsville Crossing, LLC, and Thomas A. Norris demand judgment against Defendants Eagle Commercial Ventures, LLC, EagleBank, and Eagle Bancorp, Inc. in an amount to be proven at trial in excess of $75,000, punitive damages, pre-and post-judgment interest, costs, and such other relief as this Court deems appropriate.

## COUNT SIX
## CONSTRUCTIVE FRAUD

169.    The Norris Companies incorporate by reference Paragraphs 13 through 129 as if fully set forth in this Paragraph.

170.    The Bank owed a duty of care to the Norris Companies to transmit accurate, honest, and correct information to the Norris Companies.

171.    For the reasons set forth above, the Bank breached these duties intentionally or with reckless disregard for the Norris Companies' rights.

172.    The Bank's actions violate and undermine the private and public confidence placed in financial institutions to perform their contractual obligations competently and in good faith.

173.    The Bank's actions, intentional, negligent, or otherwise, caused substantial damages upon Plaintiffs well in excess of $75,000 in an amount to be proven at trial.

WHEREFORE Plaintiffs ElderHome Land, LLC, Burtonsville Crossing, LLC, and Thomas A. Norris demand judgment against Defendants Eagle Commercial Ventures, LLC, EagleBank, and Eagle Bancorp, Inc. in an amount to be proven at trial in excess of $75,000, punitive damages, pre-and post-judgment interest, costs, and such other relief as this Court deems appropriate.

Respectfully submitted,

Roger C. Simmons (No. 04363)
Jacob R. Dziubla (No. 22360)
Gordon & Simmons, LLC
1050 Key Parkway, Suite 101
Frederick, Maryland 21701
(301) 662-9122
(301) 898-0392 (fax)
rsimmons@gordonsimmons.com
jdziubla@gordonsimmons.com
Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL

Plaintiffs ElderHome Land, LLC, Burtonsville Crossing, LLC, and Thomas A. Norris

demand a jury trial on all counts in this action.

Respectfully submitted,

Roger C. Simmons (No. 04363)
Jacob R. Dziubla (No. 22360)
Gordon & Simmons, LLC
1050 Key Parkway, Suite 101
Frederick, Maryland 21701
(301) 662-9122
(301) 898-0392 (fax)
rsimmons@gordonsimmons.com
jdziubla@gordonsimmons.com
Attorneys for Plaintiffs